In re MISSIONARY BAPTIST FOUNDATION OF AMERICA, INC., Debtor.

Robert B. WILSON, Plaintiff,

v.

STATE OF TEXAS, Texas Department of Human Resources, Texas Department of Health, Defendants.

Bankruptcy No. 580–00084.
Adv. No. 581–0087.

United States Bankruptcy Court,
N. D. Texas,
Lubbock Division.

March 3, 1982.

Dennis O. Olson, Lubbock, Tex., for debtor; Robert B. Wilson, Lubbock, Tex., trustee.

Robert W. Gauss, Asst. Atty. Gen., Austin, Tex., for Tex. Dept. of Health.

C. Ed Davis, Asst. Atty. Gen., Austin, Tex., for State of Tex. and Tex. Dept. of Human Resources.

## MEMORANDUM AND ORDER

BILL H. BRISTER, Bankruptcy Judge.

Robert B. Wilson, Trustee, filed complaint against Texas Department of Human Resources ("DHR") and Texas Department of Health, after first obtaining permission [1] from the Legislature to sue the State. The Trustee seeks to recover from the State of Texas the sum of $130,390.33. Nonjury trial was conducted on January 25, 1982. The following summary constitutes the findings of fact required by Rule 752.

In November 1979, approximately one year prior to the time that the petition for order for relief was filed in this case, the debtor leased from the owners a facility in Wichita Falls, Texas, known as the Wood Convalescent Center. That facility became one of approximately 25 convalescent centers and nursing homes operated by the debtor over a wide area, primarily in West Texas.

The State of Texas, by virtue of its duty to protect public health and welfare, is charged with monitoring the operation of nursing home and convalescent centers. The duties of two separate state agencies are germane to the issues in this case. The Texas Department of Health is required to insure that health standards of the operation are met before a license can be issued to the facility. Among other duties the Department of Human Resources is the agency responsible for administering the medical assistance program under the Social Security Act, known as the Texas Nursing Facility Vendor Program. Under that program DHR, with matching federal funds, pays to certified intermediate care facilities an amount of money equal to the actual costs to that facility of providing services to MEDICAID eligible residents. Before a facility can be certified to participate in the Texas Nursing Facility Vendor Program it must be licensed by the Texas Department of Health and, in addition, it must meet the standards required by DHR and by the federal government. The Texas Department of Health has survey teams in the field to make the required investigations precedent to the issuance of a license. DHR has no survey personnel in the field, but legislation was adopted by the State which permits the investigatory personnel of the Department of Health to make the required survey or investigation for DHR.

Prior to the time Wood Convalescent Center was leased by debtor in November 1979 it had been licensed by the Texas Department of Health and had been certified to participate in the Texas Nursing Facility Vendor Program by DHR. Neither the license issued by Texas Department of Health nor the contract with DHR is transferrable or assignable. The leasing of the facility by debtor from the licensed and certified operators effected a "change of ownership" and required debtor to make new application to State Department of Health for license and new application to DHR for certification of eligibility to participate in the Texas Nursing Facility Vendor Program.

Debtor's lease from the owners of the Wood Convalescent Center was effective December 1, 1979. On December 14, 1979, debtor made the applicable application for licensing to Texas Department of Health and the application to DHR for certification for participation in the Texas Nursing Facility Vendor Program. Pursuant to its standing operating procedures DHR requested the investigatory personnel of the

1. Senate concurrent resolution number 67 of the 67th Legislature, Regular Session, 1981.

Department of Health to make the required survey.

On January 2, 3 and 4, 1980, the Quality Standards Division of the Texas Department of Health conducted the "change of ownership" survey of Wood Convalescent Center. The team concluded that the Wood Convalescent Center was not maintaining the minimum standards required for participation as an intermediate care facility and advised the administrator of the home of 14 deficiencies which adversely affected certification. By letter dated January 17, 1980, the director of the Quality Standards Division notified the administrator of Wood Convalescent Center that his department was proposing denial of initial certification under the "change of ownership" and further advised him that an administrative hearing, at which representatives of debtor could appear and be heard, would be conducted on that action in Austin, Texas, on Wednesday, January 30, 1980. The director of the Claims Payment Section, Special Medical Services Division of DHR, supplemented the letter from the Department of Health with his letter of January 23, 1980, confirming that if certification was denied by Texas Department of Health after hearing on January 30, 1980, the application for participation in the DHR program would be denied also.

The administrative hearing was conducted by Texas Department of Health as scheduled. The recommendation of the Quality Standards Division was accepted, certification was denied, and a new survey was ordered. The Department of Health hearing officer advised the representatives of debtor that if the resurvey was favorable to certification he would consider making the certification retroactive to January 5, 1980, the day following the completion of the initial survey.

The second survey was conducted by the same team from Department of Health on February 20, 21, 22, and 25, 1980. That team reported that there was no improvement in the deficiencies from the first survey and, in fact, that there had been deterioration in health care. The director of the Quality Standards Division, Texas Department of Health, by letter dated March 10, 1980, advised debtor's administrator of the results of the resurvey and again afforded debtor an opportunity to be heard at an administrative hearing scheduled for March 28, 1980. This time, however, there were no provisions [2] for retroactive application if resurvey was favorable to debtor. The director of the Claims Payment Section of DHR supplemented the letter from Texas Department of Health with his letter of March 19, 1980. That letter reminded the administrator of Wood Convalescent Center that if the decision at the hearing on March 28, 1980, was to deny certification, participation in the DHR program would also be denied and, in addition, that debtor would be *required* to complete another application for participation.

In the interim between the Department of Health letter of March 10, 1980, and the DHR letter of March 19, 1980, there was an occurrence which gave rise to the litigation in these proceedings. Notwithstanding non-certification of the facility, the Commissioner of Texas Department of Human Resources spontaneously executed a "contract" with Wood Convalescent Center for that facility to participate under the Texas Medical Assistance Program as an intermediate care facility. The "contract" on its face reflected that it was effective retroactively to December 14, 1979, and would terminate on September 10, 1980. It cited, erroneously, that "the facility has been certified for participation with deficiencies and therefore, notwithstanding any other provision herein, this contract shall automatically terminate on the 30th day of May, 1980, if the deficiencies noted by the survey agency have not been corrected within the time required by the survey agency and allowed by federal regulations."

2. The letter from the director stated: "Please be advised that the effective date of any new certification can be *no earlier* than the date our representatives verify, by on-the-site inspection, that corrections are made on all deficiencies which were the basis for denial of certification." (emphasis added)

The Commissioner of DHR did not testify at the trial of this case and the precise reason for the execution of that "contract" was never fully developed. Eschewing chivalry those officials of DHR who testified attempted to claim that the snafu was caused by error on the part of clerical employees in the office. However, the Commissioner is charged with the non-delegable responsibility of executing contracts for DHR only after proper certification, with or without deficiencies, has been established. Whether or not clerical error might have been involved the responsible person did, in fact, execute the "contract". The real issue to be resolved is whether that "contract" can be given any validity.

Presumably the executed "contract" was received by the administrator of Wood Convalescent Center a day or two prior to his receipt of the letter of March 19, 1980, from the director of the Claims Payment Section of DHR, reminding him of the administrative hearing scheduled for March 28, 1980. Wood Convalescent Center immediately took the position that the issuance of the "contract" required no further certification proceedings and so notified DHR and Department of Health. According to the testimony at the evidentiary hearing, the officials of DHR then discovered that the "contract" had been improvidently signed and delivered.

None of the parties were comfortable with their respective positions. The parties participated in the administrative hearing before the hearing officer of Texas Depart-ment of Health conducted as scheduled. Again, the decision of the Department of Health was to deny certification. However, debtor submitted a new application for certification which was *immediately approved* on April 8, 1980. Since April 8, 1980, the debtor has been receiving the vendor payments. DHR denies any liability for payment to debtor for services which debtor provided to MEDICAID eligible patients prior to April 8, 1980.

The parties have stipulated that the value of the services rendered by debtor to MEDICAID Patients during the period commencing December 14, 1979, (the date of initial application for certification) and ending on April 8, 1980, (the date when debtor became lawfully certified and commenced receiving vendor payments) is the sum of $130,390.33. The debtor filed petition for order for relief under Chapter 11 on October 15, 1980. The Trustee has succeeded to the claim against the State of Texas and has brought this complaint, seeking recovery of that sum of $130,390.33.

The Trustee urges that he should recover under the "contract" which specifically provided for payment retroactive to December 14, 1979. In the alternative, he contends that he should recover in quantum meruit or on an implied contract theory. Trustee contends that even if Texas Department of Health, the survey agency, did not certify the facility DHR itself had authority to certify a facility "with deficiencies" pursuant to 42 C.F.R. § 442.105.[3] The "contract" reflected on its face that the facility had, in

---

**3.** § 442.105 Certification with deficiencies: General Provisions.

If a survey agency finds a facility deficient in meeting the standards specified under Subpart D, E. F. or G of this part, the agency may certify the facility for Medicaid purposes under the following conditions:

(a) The agency finds that the facility's deficiencies, individually or in combination, do not jeopardize the patient's health and safety, nor seriously limit the facility's capacity to give adequate care. The agency must maintain a written justification of these findings.

(b) The agency finds acceptable the facility's written plan for correcting the deficiencies.

(c) If a facility was previously certified with a deficiency and has a different deficiency at the time of the next survey, the agency documents that the facility—

(1) Was unable to stay in compliance with the standard for reasons beyond its control, or despite intensive efforts to comply; and

(2) Is making the best use of its resources to furnish adequate care.

(d) If a facility has the same deficiency it had under the prior certification, the agency documents that the facility—

(1) Did achieve compliance with the standard at some time during the prior certification period;

(2) Made a good faith effort, as judged by the survey agency, to stay in compliance; and

(3) Again became out of compliance for reasons beyond its control.

fact, been "certified with deficiencies" and thus the trustee insists that he should recover. In addition, he claims that the debtor had provided the services to MEDICAID eligible patients during the period for which he seeks payment and that the State of Texas is unjustly enriched if it is not required to compensate the debtor.

Stripping all of the "window dressing" from the arguments and theories advanced by each of the parties there are certain basic facts which cannot be ignored. The evidence adduced at earlier hearings in this case reflect that the debtor was no neophyte in the health care area, but, to the contrary, was a very experienced leader in the nursing home and convalescent home field. Debtor's officials knew, and had reason to know, the requirements imposed upon DHR and the procedures which must be followed concerning certification. The receipt of the executed "contract" was a bit of serendipity which did not mislead the debtor for any length of time. It's officials knew that the State Department of Health had not certified the facility and they knew that until that certification had been obtained DHR could not validly contract with it. It was not mislead into continuing to keep MEDICAID eligible patients in its home. The decision to keep those patients in the home was made by the officials of debtor alone, because from experience those officials knew that when MEDICAID eligible patients left the home they were not likely to return. Debtor kept those patients in the home during the entire interim period, hoping that the facility would be certified retroactively. Under the circumstances the State of Texas was not unjustly enriched.

The salient fact is that the federal regulations require a home to be certified by the State before matching federal funds can be paid. 42 C.F.R. § 442.12. The Texas Constitution, in Article 3, § 51a provides in part:

"The Legislature shall have authority to enact appropriate legislation which will enable the State of Texas to cooperate with the Government of the United States in providing assistance to and/or medical care on behalf of needy persons, in providing rehabilitation and any other services included in the federal laws making matching funds available to help such families and individuals attain or retain capability for independence or self-care, to accept and expend funds from the Government of the United States for such purposes in accordance with the laws of the United States as they now are or as they may hereafter be amended, and to make appropriations out of state funds for such purposes; *provided that the maximum amount paid out of state funds to or on behalf of any needy person shall not exceed the amount that is matchable out of federal funds....*" (emphasis added)

That article effectively prevents the use of state funds from being paid to needy persons unless there are matching federal funds available. Until the facility was properly certified neither federal funds nor state funds could properly be paid to the facility. The regulatory framework within which the State and federal MEDICAID agencies operate was established for the protection of public health and welfare. It is the duty of the Court to decline to give validity to any "contract" which involves the doing of an act prohibited by statutes intended for the protection of public health and welfare. *Peniche v. AeroMexico*, 580 S.W.2d 152, 156 (Tex.Civ.App.—Houston, 1979), no writ. The Commissioner did not have the power to enter into the challenged "contract" and thus no contract ever existed in fact.

Debtor is precluded from recovering in quantum meruit for the same reason. Because DHR was without power and authority to enter into any agreement with the debtor during the period of noncertification there can be no recovery in quantum meruit. *Foster v. City of Lubbock*, 412 S.W.2d 376 (Tex.Civ.App.—Amarillo, 1967) writ ref. n. r. e.; *Ochiltree v. Hendrick*, 366 S.W.2d

(e) If an ICF or ICF/MR has a deficiency of the types specified in § 442.112 or § 442.113 that requires a plan of correction extending beyond 12 months, the agency documents that the conditions of those sections are met.

866 (Tex. Civ.App.-Amarillo, 1963) writ ref. n. r. e. There was no consideration upon which to base recovery on an implied contract theory.

Thus while the questionable "mistake" argument advanced by the defendants lacks persuasiveness, the clearly dispositive theory in this instance is that the contract entered into by DHR was done so illegally. The federal regulations make it clear that no federal MEDICAID payments are to be disbursed by a State MEDICAID agency to an uncertified convalescent facility. The survey agency, at all times relevant to this case, found that conditions at Wood Convalescent Facility were such that the minimum requirements necessary for certification were not met. No federal funds could be provided to the facility and, absent federal funds, payment of state funds would be ·violative of the Texas Constitution.

I conclude, therefore, that the "contract" executed by DHR on March 18, 1980, and delivered to debtor was entered into illegally and is void. I conclude, also, that the debtor has demonstrated no detrimental reliance upon that "contract" and is not otherwise entitled to recovery on an implied contract theory nor in quantum meruit.

LET JUDGMENT BE ENTERED ACCORDINGLY.